7-2284 Novartis v. Ezra Ventures May I please the Court? Good morning, Your Honours. My name is Shashank Upadhyay, I mean Tiladi Upadhyay for Ezra the Appellant here. For some initial housekeeping, there were some confidential portions of the original briefs. Those issues have been waived so there's no need to clear the courtroom. We don't intend to get into any confidential information. At this point, in terms of the issues, Novartis takes a frontal attack that Section 156, a very mechanistic approach, that satisfying 156 requirements to get the PTE in the first place is immunity, a shield, a defense from any double patenting type of argument that can be raised. It logically creates a problem that nowhere in Section 156, the text of 156 itself, does it say that double patenting is excluded from one of the defenses. If you take that approach and import double patenting as a defense or as an exclusion from Section 156 PTE attacks, then there's no logical reason why Section 102 defenses, 103 defenses, 112 defenses cannot equally be raised in a PTE challenge. In their red brief, they have consistently taken the approach that this mechanistic approach of satisfying 156 requirements is the end of the question. They say this repeatedly in red brief from 26 to 27. What's important to understand is at the very same time when 156 was being promulgated, back in 1984, the Congress included a very specific exclusion in Section 282 in the defenses section. They said specifically, when it comes to patent term extensions in Section 156, you're not allowed to challenge the due diligence period. Congress knew what it was doing when it said, here's 156 as a grant of PTE. As a consequence of that, here is a specific defense that you can't take. In addition, Congress has amended Section 282 a couple of times. They've said you can have best mode as a requirement for patentability, but you can't challenge best mode later in Section 282 as a defense. They've taken that as a carve out. In Congress, if they don't like the fact that double patenting can be used to remove patent term extension, then they can fix it. They have taken all those opportunities to fix it. Congress has also done so in another section, in Section 121. It says in the divisional practice that there is a safe harbor. You cannot use double patenting against a patent that is a divisional of a parent, and you can't use double patenting. Congress is well aware of these situations, and they can take action should they choose to. Let's focus our attention exactly on what this situation is here. Originally, we had the 229 compound patent set to expire in February of 2014. However, at the very last day, right around the patent expiration, the patent term extension was actually granted and kicked it out until February of 2019. At the top of next year, this 229 patent is going to expire. Underlying, however, was the 565 patent, which is the method of use patent that claims specifically the use of fingolimod to treat the disease condition. Now, throughout this entire litigation, there has been no dispute over various facts, and that is the 229 compound patent expires in February of 2019. There is PTE to a certain set of compound claims. There is a PTE to one claim, Claim 48, that has been extended, which is a method of use claim within the 229 patent. Now, we note that in the final judgment, Claim 46 was also included, but Claim 46 was actually not part of the PTE, and therefore, it died its natural death back in February of 2014. When we look at that and we see the 565 patent specifically claims fingolimod, again, there's no dispute, absolutely no dispute that fingolimod is the basic chemical compound that is recited in the 565 patent. Then when we add to that, what do these patents claim? The 229 patent claims the compound and the method of use of using that compound, as I mentioned before. Then in addition, the 565 patent claims the method of use. Novartis took various actions to ensure that these patents were listed in the Orange Book. When the NDA was granted in September of 2010, they had a 30-day period under law, under 355B1, to list the patents that they thought that they could list in the Orange Book that claimed Guidelinea, their NDA-approved product. They had a 30-day period to do so. You look at your arsenal of all your patents that you have and you make a analysis that's used to determine whether you can list patents in the Orange Book to comply with your statutory duty to comply with the Orange Book. I've been waiting for you to talk about Merck versus Hitech. That's, to me, the main event. I know you're interested in telling the story, but we have this case. It sounds pretty cut and dry. You need to figure out an answer for Merck. Yesterday in the Breckenridge argument, Judge Chen, you had asked some questions about the Breckenridge case. I wanted to clarify because I'm not entirely sure whether it was clear. In the Merck case, the underlying patent that was used for the double patenting did not claim the dorazolamide, the actually NDA-approved product. It was actually a patent that claimed the adjacent homologue and later, the patent that was at the patent in suit. You have to answer for the actual words written in the opinion. Words written in the opinion say that we have one patent disclaiming its term in light of another patent, but nevertheless under Section 156, it's okay for that patent that had been disclaimed to tie off its expiration date against another patent to go ahead and enjoy a patent term extension under Section 156 because in the court's view, Section 156 is very clear with the shall language and Section 156 lays out all the requirements. As long as those requirements are met, Congress has made a choice to, in light of the different challenges patent owners have with FDA review, to give the patent owners the choice, the flexible choice, to pick one of any related patents for a particular drug to go ahead and enjoy a patent term extension under Section 156 and then also pointed out in Section 154 when it comes to patent term adjustment, patent term adjustment does potentially get cut off by ODP and terminal disclaimers in a way that this court said in Merck isn't necessarily true for Section 156. Without getting into the stories of the facts of these various cases, what we have to confront is the actual legal analysis that our court has already undertaken in interpreting Section 156. Could you please respond to that? Sure, Your Honor. The Merck case, obviously that Merck case talked about PTE being applied to a patent that had already been terminated to a disclaim. One source of distinction is in fact these patents are not related in our Ezra case. These patents are not continuations of each other. They are completely unrelated in terms of their lineage or their ancestry and that in addition, in this particular case, both the underlying 229 patent has lived its full life. It naturally expired in February of 2019. The method of use patent, the 565, has lived its full 20-year life. But to the extent that there are distinctions that can be made is that the precise issue in the Merck case, it literally said the issue that was presented before them was whether the term of double patenting can be used to cut off a PTE for a patent that had already been terminated disclaim. That's not the issue here. The holding in Merck also said the same thing. It related to the fact the holding and the issue as presented did discuss the fact that there was a terminal disclaimer that was already in place that pre-terminated the natural life of that patent and then whether PTE could be stacked on to that patent. So in this, as I said, so in this case, we are not in that situation where we have patents that are being prematurely terminated. We are not having any issue of lineage and whether one patent is being used against. What we are saying is that, and to be more direct, our focal point here is on what happened in that 60-day period of time. Nothing in the Merck v. HITECH case says that when applying for the PTE and that mechanistic approach of applying for the PTE gives you that shield from any other type of argument or any other type of invalidity. We have always said that Novartis had various choices to make. Now in the Merck case, there was no choice to make. They could not have made the proper choice because in the Merck case, that other patent did not cover dorazolamide. It could not have been subject to a PTE. Merck could not have selected both and then during the PTE process, evaluate the patents and then when the PTE was ready to be granted, normally the MPE allows you that choice to now select which one you are actually going to select. This is what we have always been arguing that Novartis had these options available to it. It ought to have taken that diligent approach. It has to make the choice of when to apply for a PTE, the patents that it applies to and then ultimately the patent that it selects for the PTE has to be a thoughtful choice. A thoughtful choice that says when this 565 patent in this case expires, how does one practice the invention of the 565 patent without running afoul of the 229 patent? One cannot. There has been no dispute that there can be practicing of the 565 patent in this case. Where did we say in Merck that the patent owner is somehow restricted or confined or regulated in which patent it chooses to select for patent term extension? In the Merck case, there was no language about choice because there was no choice to make. It quoted the legislative history about a flexible choice because an earlier bill had restricted the patent owner to pick a particular patent, i.e. the very first issued of a set of related patents and then ultimately removed that provision and this court interpreted what was actually enacted as providing in the words of Congress a flexible approach to permit the patent owner to make unilaterally whatever choice they wanted. I don't see this thoughtful approach notion in Merck. In fact, Merck, in my reading, reads the contrary. I'm in my rebuttal time, but I'd like to answer. In the Merck case, there was no thoughtfulness of choice necessary because as I mentioned before, the underlying patent, there was no choice to make. The legislative history suggests that patent applicants have a choice to make, but nowhere in the legislative history does it say that that choice is immutable. There's immunity to that choice. There's some statements here by Congressman Waxman and Congressman Bliley in the House report, I would note that they had specifically said that in selecting PTE, all other aspects of the patent law do apply, right? And all other aspects of the patent law are double patenting, 102, 103, 112, right? That's at A3932 at the top, that's the House report. All other provisions of patent law do apply. And in the Merck case, no one said that that choice is an immutable choice. If you'd like to save the rest of your rebuttal time, we should probably move on, Ms. Love. May it please the Court, I'm Jane Love for the Appellees. Section 156 commands that the partial compensation for the time lost during FDA review. In this case, only one patent was extended. Only one application for extension was filed, and only one extension certificate was granted. Ezra's argument that the extension on this one patent effectively extended another has no precedent. In the 30 years, the PTO and FDA have administered Section 156. There is precedent, however, directly supporting the decision below. The 2007 Merck v. Hitech case says that a patent term extension is available and proper, even if it extends into the time that was cut off by a terminal disclaimer to obviate a double patenting rejection. The Merck opinion says, quote, the terminal disclaimer did not foreclose the Hatch-Waxman extension. That's at 1320. The Merck opinion also says Section 156 has language that is, quote, unambiguous. That should end the matter. The word shall indicates that if the list of requirements in Section 156 is met, the patent term is entitled to be extended. So it is here. Ezra does not even question this point. Ezra identifies no requirement in Section 156 that was not in Section 156 legislative history supports its reading of the law. Congress rejected a draft bill that applied PTE to only the first issued patent. Instead, the lawmakers wanted the patent holder to have flexibility to choose, as they put it, the most important patent. Here, the Appellees selected the 229 patent for extension, just as the lawmakers envisioned. Nothing in the law or the rules requires anything more. Ezra also says that it was inconsistent with the idea that expired patents are dedicated to the public. Ezra is mistaken. The expiration of a patent has the effect of terminating the exclusionary rights granted only in that patent. There may exist other unexpired patents that similarly restrict the public. Thus, the expiration of one patent does not confer upon the world the unqualified affirmative right to do everything it claimed. Is it your view that obviousness-type double patenting has no role at all to play when it comes to patents that are extended under Section 156? No, Your Honor. I think there may be instances where double patenting may play a role in conjunction with something that is unjust, like inequitable conduct. So, if a patent is unenforceable because of inequitable conduct, then the patent is gone, and so even if the patent had been extended, say, five years under 156, that patent extension would also be gone. That's correct. That's correct, Your Honor. Or I guess another way, another example could be if the patent that you extended by, say, five years under Section 156, should have been subject to a terminal disclaimer, maybe because it issued second and there was an earlier issued patent, and that this patent should have then, therefore, had its original term disclaimed to tie off with the expiration date of the first issued patent. The patent owner doesn't file that terminal disclaimer and then says, oh, and then I want an extra five years of patent extension. I guess it would be your view that that patent would be invalid, because even though the extension might have been legitimate, it rested on a patent that was invalid for obviousness type double patent. Does my question make sense? Do you understand the fact pattern I'm raising? I'm not sure, Your Honor, if you're suggesting that the mistake, if you will, of not bringing forward the obviousness type double patenting issue and resolving it with a terminal disclaimer was done at the patent office or not. I'm not sure if that would make a difference. I guess the fact pattern is there should have been a terminal disclaimer file for the patent. And so now what we have is a second issued patent whose term goes beyond the term of the first issued patent. But nevertheless, for that second patent, the patent owner selects that one to get extension under 156. So now instead of going just five years beyond the first issued patent, it's going six or seven years beyond the first issued patent, because it should have but did not get a terminal disclaimer file. It's hard to say, Your Honor, without the rest of the facts of the case in order to see if there is actually something unjust going on. There is clear a record from this court in the Gilead case that shows the patent term extension being an exception to double patenting. That footnote was brief and it's dict of the case, but it is there. And it may have an assumption underlying it that everything else was proper and therefore there would be an exception. And your question is where there was something improper in that there was not a terminal disclaimer filed in view of a true obviousness type double patenting rejection. So I could answer in the affirmative to your question, given those assumptions. In the pharmaceutical context, Congress permits this situation to exist, multiple patents. And those multiple patents covering an approved product were expected by Congress. They expressly wrote into Section 156 that the patent holder can select one of them for an extension. Weighing other policy concerns, Congress narrowed the nature of that extension. That is the whole scope of the original patent claim is not extended. The rights granted under Section 156B are tailored and limited to any approved use of the approved product. Thus, here, the original scope of the 229 patent is reduced to only Fingolimod for only the FDA approved uses. Ezra's reliance on broad assertions of policy ignores that weighed public policy very carefully already when promulgating the Hatch-Waxman laws. Indeed, Ezra's complaint that the public is unable to practice the 565 patent is wrong. Because Section 156 granted only a narrowed right limited to Fingolimod for the approved use, the public could practice the 565 patent upon its expiration in, for example, methods for mammals other than humans. The claims in the 565 patent are as broad as mammals. Lastly, Ezra manufactures an argument that the award of the PTE to the 229 patent somehow transmogrified the 565 patent into a double patenting reference. Again, Ezra is wrong. Obviousness type double patenting is a doctrine created to stop unjustified extension of the and it is the epitome of a justified circumstance of patent term extension. Double patenting does not apply to the limited rights granted within a patent term extension. Here, Ezra attempts to create an issue where there is none. The 565 patent was never a double patenting reference against the 229 patent. It would have been impossible for the 565 patent to be a double patenting reference because the 565 patent was filed months after the 229 patent issued. In other words, the 565 patent application was not in existence when the 229 patent was undergoing examination. Ezra's argument ignores this fact. Ezra's position would frustrate the purpose of section 156. According to Ezra, once the 229 patent received the patent term extension, the 565 patent was suddenly converted into a double patenting reference. It cannot be that the patent term extension once granted is immediately taken away. According to Ezra, no extension should be awarded here, even though all requirements of the statute were met. Ezra criticizes patent holders' choice, but by law, Congress gave patentees freedom to choose. Ezra cannot use a judicially created doctrine to undo Congress's unambiguous language and purpose that matured into law. Consistent with the 2007 Merck decision, this court recognized in the 2014 Gilead decision that section 156 term extensions are an exception to the general rule. Although it's not as holding as I mentioned, the footnote correctly states how section 156 squares with the judicially created doctrine. Obviousness type double patenting simply does not apply to extensions under section 156. Elsewhere, the patent statute itself confirms that double patenting cannot be used to invalidate a term extension. Section 282 sets out affirmative defenses to patent infringement. Section 282C is particularly directed to invalidity of term extensions under 156. It only states that a material failure to comply with section 156 is a ground for invalidity of patent term. Double patenting is not mentioned at all. Ezra could have challenged the validity of the PTE for failure to meet the requirements pursuant to section 282, but it cannot do so for obviousness type double patenting. In its briefs, Ezra's reliance on the non-binding district court case, Novartis v. Breckenridge is inappropriate. It's not binding on this court. Even if it were binding, the section 156 extension was not at issue in that case. The district court explicitly stated, quote, it is not the section 156 extension that is at issue here. The double patenting reference in question in Breckenridge was eligible as a reference before the PTE award and after, and the parties stipulated in that case to double patenting. Here, the 565 patent was not eligible as a double patenting reference, and the parties have not stipulated to double patenting. Finally, even if Ezra were right- You said lastly three minutes ago. You don't get to say finally three minutes later. Go ahead. I'm sorry, Your Honor. I will keep it very brief. Even if Ezra- You gave that up five minutes ago. The last question was at 830, and you're approaching 330. Even if Ezra were right that the 565 patent transmogrifies into a double patenting reference, Ezra abandoned the argument below. It never bothered to prove that the 565 patent actually invalidates any claim of the 229 patent. Judge Stark denied Ezra's motion for judgment on the pleadings. Ezra declined to bring up any evidence before summary judgment or trial. There was no claim construction, no expert testimony, no evidence on double patenting. Even if Ezra were right that double patenting could apply here, Ezra has simply failed to even try to meet its burden. We ask the court to affirm. Thank you. Rebuttal time. Thank you, Your Honor. I wanted to respond to Judge Chen's question regarding what defense might be available for double patenting and whether double patenting. Struggle as I might, I don't see that inequitable conduct in Section 156 or in Section 282. I can't see anywhere in those statutes that allows now a double patenting only to be made for inequitable conduct. Why inequitable conduct? Why now? Why here? Why that one? If you take Novartis at face value, the mechanistic approach to satisfying Section 156 is an absolute immunity once you're in the PTE. There is no defense at all, whether under Section 101, 102, 103 or 112, that can be made. Novartis also mentioned Gilead footnote 6 as if it creates some exalted rule or escalates it to Gilead footnote 6. All it said was for the wholly unremarkable proposition that in certain URAA or pre-URAA extensions, there may be changed expiration dates. It's a wholly unremarkable proposition to have said. Novartis also criticized ESRA for not establishing certain facts regarding the 565 patent. It was our contention that the judge was wrong. The facts were established and they were clear and they were undisputed. There was no further expert testimony would have been that Novartis created a use code. It said treatment of autoimmune disease. It was undisputed that the 229 patent claims Fingolimod. It has method claims. There was no dispute that Novartis listed those patents into the Orange Book. They averred to the FDA that these patents actually belong. At that point in time, there was sufficient evidence to hold that the double circumstances.